## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| WILLIAM LAWRENCE, Individually and on Behalf of All Others Similarly Situated, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No. |
| DUPONT FABROS TECHNOLOGY, INC. 401 9th Street NW, Suite 600 Washington, D.C. 20004 | ) ) ) ) | **CLASS ACTION COMPLAINT FOR VIOLATIONS OF SECTIONS 14(a) AND 20(a) OF THE SECURITIES EXCHANGE ACT OF 1934** |
| LAMMOTT J. DUPONT, 401 9th Street NW, Suite 600 Washington, D.C. 20004 | ) ) ) ) | **JURY TRIAL DEMANDED** |
| MICHAEL A. COKE, 401 9th Street NW, Suite 600 Washington, D.C. 20004 | ) ) ) ) | |
| THOMAS D. ECKERT, 401 9th Street NW, Suite 600 Washington, D.C. 20004 | ) ) ) ) | |
| FREDERIC V. MALEK, 401 9th Street NW, Suite 600 Washington, D.C. 20004 | ) ) ) ) | |
| JOHN T. ROBERTS, JR., 401 9th Street NW, Suite 600 Washington, D.C. 20004 | ) ) ) ) | |
| JOHN H. TOOLE, 401 9th Street NW, Suite 600 Washington, D.C. 20004 | ) ) ) ) | |
| CHRISTOPHER P. ELDREDGE, 401 9th Street NW, Suite 600, Washington, D.C. 20004 | ) ) ) ) | |
| MARY M. STYER, 401 9th Street NW, Suite 600 Washington, D.C. 20004 | ) ) ) ) | |
| Defendants. | ) ) | |

Plaintiff William Lawrence ("Plaintiff"), by his undersigned attorneys, alleges upon personal knowledge with respect to himself, and upon information and belief based upon, *inter alia*, the investigation of counsel as to all other allegations herein, as follows:

## NATURE OF THE ACTION

1.      This action is brought as a class action by Plaintiff on behalf of himself and the other public holders of the common stock of DuPont Fabros Technology, Inc. ("DuPont" or the "Company") against the Company and the members of the Company's board of directors (collectively, the "Board" or "Individual Defendants," and, together with DuPont, the "Defendants") for their violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78n(a), 78t(a), SEC Rule 14a-9, 17 C.F.R. 240.14a-9, and Regulation G, 17 C.F.R. § 244.100, in connection with the proposed merger (the "Proposed Merger") between DuPont and affiliates of Digital Realty Trust, Inc. ("DLR").

2.      On June 8, 2017, the Board caused the Company to enter into an agreement and plan of merger ("Merger Agreement"), pursuant to which each share of common stock of DuPont will be converted into the right to receive 0.545 shares of DLR common stock, and each share of 6.625% DuPont Series C preferred stock will convert into the right to receive one share of a newly designated class of preferred stock of DLR with substantially similar rights, privileges, and preferences as the DuPont Series C preferred stock (the "Merger Consideration"). The Merger consideration represents a premium of approximately 14.9% to DuPont's stock price, based on closing prices on June 8, 2017.

3.      On July 10, 2017, in order to convince DuPont stockholders to vote in favor of the Proposed Merger, the Board authorized the filing of a materially incomplete and misleading Form S-4 Registration Statement (the "S-4") with the Securities and Exchange Commission ("SEC"), in

violation of Sections 14(a) and 20(a) of the Exchange Act.

4.      While Defendants are touting the fairness of the Merger Consideration to the Company's stockholders in the S-4, they have failed to disclose certain material information that is necessary for stockholders to properly assess the fairness of the Proposed Merger, thereby rendering certain statements in the S-4 incomplete and misleading.

5.      In particular, the S-4 contains materially incomplete and misleading information concerning the financial projections for the Company.

6.      It is imperative that the material information that has been omitted from the S-4 is disclosed to the Company's stockholders prior to the forthcoming stockholder vote so that they can properly exercise their corporate suffrage rights.  For these reasons, and as set forth in detail herein, Plaintiff asserts claims against Defendants for violations of Sections 14(a) and 20(a) of the Exchange Act, and Rule 14a-9 and Regulation G, 17 C.F.R. § 244.100.  Plaintiff seeks to enjoin Defendants from holding the stockholder vote on the Proposed Merger, set for **August 15, 2017**, and taking any steps to consummate the Proposed Merger unless and until the material information discussed below is disclosed to DuPont stockholders sufficiently in advance of the vote on the Proposed Merger or, in the event the Proposed Merger is consummated, to recover damages resulting from the Defendants' violations of the Exchange Act.

## JURISDICTION AND VENUE

7.      This Court has subject matter jurisdiction pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331 (federal question jurisdiction) as Plaintiff alleges violations of Section 14(a) and 20(a) of the Exchange Act.

8.      Personal jurisdiction exists over each Defendant either because the Defendant conducts business in or maintains operations in this District, or is an individual who is either

present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over Defendant by this Court permissible under traditional notions of fair play and substantial justice.

9.      Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, as well as under 28 U.S.C. § 1391, because: (i) the conduct at issue had an effect in this District; and (ii) DuPont's principal executive offices are located in this District.

## PARTIES

10.      Plaintiff is, and at all relevant times has been, a DuPont stockholder.

11.      Defendant DuPont is incorporated in Maryland and maintains its principal executive offices at 401 9th Street NW, Suite 600, Washington, D.C. 20004.  DuPont's common stock is listed on the NYSE and trades under the ticker symbol "DFT".

12.      Individual Defendant Lammot J. du Pont ("du Pont") has served as Chairman of the Board of Directors since 2007.

13.      Individual Defendant Christopher P. Eldredge ("Eldredge") has served as President, Chief Executive Officer and Director of the Company since February 2015.

14.      Individual Defendant John Roberts, Jr. ("Roberts") has served as a director of the Company since February 2011.

15.      Individual Defendant Michael A. Coke ("Coke") has served as a director of the Company since 2007.

16.      Individual Defendant Thomas D. Eckert ("Eckert") has served as a director of the Company since October 2007.

17.      Individual Defendant Frederic V. Malek ("Malek") has served as a director of the Company since October 2007.

18.     Individual Defendant John H. O'Toole ("O'Toole') has served as a director of the Company since October 2007.

19.     Individual Defendant Mary M. Styer ("Styer") has served as a director of the Company since May 2015.

20.     The Board and DuPont may collectively be referred to as "Defendants."  Each of the Individual Defendants herein is sued individually, and as an aider and abettor, as well as in his or her capacity as an officer and/or director of the Company, and the liability of each arises from the fact that he or she has engaged in all or part of the unlawful acts, plans, schemes, or transactions complained of herein.

## CLASS ACTION ALLEGATIONS

21.     Plaintiff brings this class action pursuant to Fed. R. Civ. P. 23 on behalf of himself and the other public stockholders of DuPont (the "Class").  Excluded from the Class are Defendants herein and any person, firm, trust, corporation, or other entity related to or affiliated with any Defendant.

22.     This action is properly maintainable as a class action because:

a.     The Class is so numerous that joinder of all members is impracticable.  As of June 6, 2017, there were approximately 77,836,110 shares of DuPont common stock outstanding, held by hundreds to thousands of individuals and entities scattered throughout the country.  The actual number of public stockholders of DuPont will be ascertained through discovery;

b.     There are questions of law and fact that are common to the Class that predominate over any questions affecting only individual members, including the following:

5

i)    whether Defendants have misrepresented or omitted material information concerning the Proposed Merger in the S-4 in violation of Section 14(a) of the Exchange Act;

ii)    whether the Individual Defendants have violated Section 20(a) of the Exchange Act; and

iii)    whether Plaintiff and other members of the Class will suffer irreparable harm if compelled to vote their shares regarding the Proposed Merger based on the materially incomplete and misleading S-4.

c.    Plaintiff is an adequate representative of the Class, has retained competent counsel experienced in litigation of this nature, and will fairly and adequately protect the interests of the Class;

d.    Plaintiff's claims are typical of the claims of the other members of the Class and Plaintiff does not have any interests adverse to the Class;

e.    The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class, which would establish incompatible standards of conduct for the party opposing the Class;

f.    Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole; and

g.    A class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

## SUBSTANTIVE ALLEGATIONS

### I.    The Proposed Merger

23.    DuPont is a real estate investment trust (REIT) that owns, acquires, develops and operates wholesale data centers. The Company's customers include national and international enterprises across various industries, such as technology, Internet, content providers, cloud providers, media, communications, healthcare and financial services. Its data centers are located in four population centers: Northern Virginia; suburban Chicago, Illinois; Piscataway, New Jersey, and Santa Clara, California. As of December 31, 2016, the Company owned various properties, including 11 operating data centers facilities encompassing 3.3 million gross square feet and 287 megawatts of power available to its customers to operate their servers and computing equipment; five phases of existing data center facilities under development; one shell of a data center under development; two data center facilities with a phase or phases available for development, and parcels of land held for development of four data centers.

24.    The Company provides certain technical services to customers as a contractor on a purchase order basis, including layout design and installation of electrical power circuits, data cabling, server cabinets and racks, computer room airflow analyses and monitoring and other services requested by customers.[1]

25.    On June 9, 2017, the Company announced the Proposed Merger in a press release which states the following, in relevant part:

> SAN FRANCISCO and WASHINGTON, June 9, 2017 /PRNewswire/ -- Digital Realty (NYSE: DLR), a leading global provider of data center, colocation and interconnection solutions, and DuPont Fabros (NYSE: DFT), a leading owner, developer, operator and manager of enterprise-class, carrier-neutral, large scale multi-tenant data centers, announced today they have entered into a definitive agreement under which DuPont Fabros will merge with Digital Realty in an all-

---

[1] https://www.reuters.com/finance/stocks/companyProfile?symbol=DFT.

stock transaction. The consummation of the transaction is subject to customary closing conditions, including approval by the shareholders of Digital Realty and DuPont Fabros. Under the terms of the agreement, DuPont Fabros shareholders will receive a fixed exchange ratio of 0.545 Digital Realty shares per DuPont Fabros share, for a transaction valued at approximately $7.6 billion in enterprise value.

**Transaction Delivers Key Strategic and Financial Benefits**

**Enhances Ability to Serve Top U.S. Metro Areas:** DuPont Fabros' portfolio is concentrated in top U.S. data center metro areas across Northern Virginia, Chicago and Silicon Valley. The transaction will help grow Digital Realty's presence in strategic, high-demand metro areas with strong growth prospects, while achieving significant diversification benefits for Dupont Fabros' shareholders from the combination with Digital Realty's existing footprint of 145 properties across 33 global metropolitan areas.

**Expands Hyper-Scale Product Offering:** DuPont Fabros' 12 purpose-built, in-service data centers will significantly expand Digital Realty's hyper-scale product offering and improve its ability to meet the rapidly growing needs of cloud and cloud-like customers, in addition to enterprise customers undertaking the shift to a hybrid cloud architecture. Conversely, the transaction enables DuPont Fabros to address a broader set of customers' data center requirements, with the addition of Digital Realty's colocation and interconnection product offerings.

**Solidifies Blue-Chip Customer Base:** DuPont Fabros' impressive roster of blue-chip customers will further enhance the credit quality of Digital Realty's existing customer base. On a combined basis, investment grade or equivalent customers will represent more than 50% of total revenue. The transaction also significantly reduces DuPont Fabros' customer concentration. The combined company's top three customers will account for approximately 18% of revenue compared to 57% for the top three customers of DuPont Fabros on a standalone basis.

**Development Pipeline Provides External Growth Potential:** DuPont Fabros' six data center development projects currently under construction are 48% pre-leased and represent a total expected investment of approximately $750 million, and amount to roughly a 26% expansion of its standalone critical load capacity. These projects are located in Ashburn, Chicago, Santa Clara and Toronto, all metro areas where Digital Realty has an existing presence. These six projects are expected to be delivered over the next 12 months, representing a solid pipeline of future growth potential. In addition, DuPont Fabros owns strategic land holdings in Ashburn and Oregon, which will support the future delivery of up to 163 megawatts of incremental capacity, along with 56 acres of land recently acquired in Phoenix.

**Size and Scale Generate Incremental Benefits:** The two companies' operating models are highly complementary, and the combined organization is expected to

provide the most comprehensive product offering in the data center sector. Given the enhanced size and scale, the combined company is also expected to have the most efficient cost structure and the highest EBITDA margin of any U.S.-based publicly-traded data center REIT.

**Creates Substantial Anticipated Cost Efficiencies and Financial Benefits:** The combination of the two companies is expected to create an opportunity to realize up to $18 million of annualized overhead savings, resulting from both companies' complementary business operations. Upon closing, the transaction is expected to be immediately accretive to financial metrics, and is expected to further improve balance sheet strength.

"This strategic and complementary transaction significantly enhances Digital Realty's ability to support the growth of hyper-scale users in the top U.S. data center metro areas, while providing meaningful customer and geographic diversification for DuPont Fabros," said A. William Stein, Digital Realty's Chief Executive Officer. "The combination is expected to generate both operating and financial benefits, and I'd like to congratulate Scott Peterson, Mark Walker and their team on successfully negotiating the largest transaction in our company's history, a combination that we believe will enhance our ability to create significant long-term value for both sets of shareholders."

"We are excited to deliver this compelling transaction to our shareholders and execute upon two of the strategic objectives embodied in our corporate vision – diversifying our customer base and expanding our geographic presence," said Christopher P. Eldredge, DuPont Fabros' President & Chief Executive Officer. "As part of Digital Realty, our shareholders will continue to realize the benefits of our high-quality portfolio, with the added benefits of belonging to an even greater data center network with a truly global footprint and a well-diversified customer base. We also believe our shareholders will greatly benefit from Digital Realty's investment grade balance sheet and more attractive cost of capital. We look forward to working closely with the Digital Realty team over the coming months to close the transaction and bring our two companies together."

## II. The Merger Consideration Appears Inadequate in Light of DuPont's Recent Financial Performance and Growth Prospects

26.     The Merger Consideration appears inadequate in light of the Company's recent financial performance and prospects for future growth. Indeed, for the full fiscal year 2016, the Company reported total revenue of $528.7 million, a 14.4% increase from total revenue of $452.4 reported for the full fiscal year 2015.

27.     The Company's success has continued into the current fiscal year. On April 27,

2017 in a press release announcing its first quarter ended March 31, 2017 ("Q1 2017 earnings report"), the Company reported total revenue of $139.5 million, up 12% from the first quarter of 2016.  Dupont primarily attributed the increase to the commencement of new leases.

28.    DuPont's earnings also increased $0.09 per share, or 25%, year over year, which was primarily due to new leases that commenced during 2016 and the first quarter of 2017, according to the Company's Q1 2017 earnings report.  Commenting on the Company's first quarter 2017 and second quarter 2017 highlights to date, Defendant Eldredge stated, "[DuPont] is extremely honored that our top customers continue to value and expand their relationship with us, evidenced by the record-setting volume of leases signed year to date."

29.    Thus, it appears that DuPont is well-positioned for financial growth and that the Merger Consideration fails to adequately compensate the Company's stockholders. It is imperative that Defendants disclose the material information they have omitted from the S-4, discussed in detail below, so that the Company's stockholders can properly assess the fairness of the Merger Consideration for themselves and make an informed decision concerning whether to vote in favor of the Proposed Merger.

## III.    The Materially Incomplete and Misleading S-4

30.    On July 10, 2017, Defendants caused the S-4 to be filed with the SEC in connection with the Proposed Merger.  The S-4 solicits the Company's stockholders to vote in favor of the Proposed Merger.  Defendants were obligated to carefully review the S-4 before it was filed with the SEC and disseminated to the Company's stockholders to ensure that it did not contain any material misrepresentations or omissions.  However, the S-4 misrepresents and/or omits material information that is necessary for the Company's stockholders to make an informed decision concerning whether to vote in favor of the Proposed Merger, in violation of Sections 14(a) and 20(a) of the Exchange Act.

31.     The S-4 fails to provide material information concerning DuPont's financial projections, which were relied upon by the Board in recommending that the shareholders vote in favor of the Proposed Transaction.  S-4, 105-07.  The financial projections were also relied upon by the Company's financial advisor, Goldman Sachs & Co. LLC ("Goldman Sachs"), in rendering its fairness opinion.  S-4, 93.

32.     Specifically, while the S-4 defines and discloses unlevered free cash flows ("UFCF"), EBITDA, and adjusted funds from operations ("AFFO"), the S-4 fails to: (i) provide line item projections for the metrics used to calculate these non-GAAP measures and (ii) reconcile the non-GAAP projections to the most comparable GAAP measures.

33.     With respect to UFCF, the definition incorporates the unreconciled metric of UFCF, as well as the undisclosed line items (i) interest expense and (ii) preferred stock dividends. With respect to EDITBA, the definition incorporates undisclosed line items (i) interest, (ii) taxes, and (iii) depreciation and amortization.

34.     If a registration statement discloses financial projections, those projections must be complete and accurate.  Similarly, when a company discloses non-GAAP financial measures in a registration statement, the Company must also disclose all projections and information necessary to make the non-GAAP measures not misleading, and must provide a reconciliation (by schedule or other clearly understandable method) of the differences between the non-GAAP financial measure disclosed or released with the most comparable financial measure or measures calculated and presented in accordance with GAAP.  17 C.F.R. § 244.100.

35.     Indeed, the SEC has recently increased its scrutiny of the use of non-GAAP financial measures in communications with stockholders.  The former SEC Chairwoman, Mary Jo White, recently stated that the frequent use by publicly traded companies of unique company-

specific non-GAAP financial measures (as DuPont included in the S-4 here), implicates the centerpiece of the SEC's disclosures regime:

> In too many cases, the non-GAAP information, which is meant to supplement the GAAP information, has become the key message to investors, crowding out and effectively supplanting the GAAP presentation. Jim Schnurr, our Chief Accountant, Mark Kronforst, our Chief Accountant in the Division of Corporation Finance and I, along with other members of the staff, have spoken out frequently about our concerns to raise the awareness of boards, management and investors. And last month, the staff issued guidance addressing a number of troublesome practices *which can make non-GAAP disclosures misleading*: the lack of equal or greater prominence for GAAP measures; exclusion of normal, recurring cash operating expenses; individually tailored non-GAAP revenues; lack of consistency; cherry-picking; and the use of cash per share data. I strongly urge companies to carefully consider this guidance and revisit their approach to non-GAAP disclosures. I also urge again, as I did last December, that appropriate controls be considered and that audit committees carefully oversee their company's use of non-GAAP measures and disclosures.[2]

36.    Last year, the SEC has repeatedly emphasized that disclosure of non-GAAP projections can be inherently misleading, and has therefore heightened its scrutiny of the use of such projections.[3]  Indeed, on May 17, 2016, the SEC's Division of Corporation Finance released new and updated Compliance and Disclosure Interpretations ("C&DIs") on the use of non-GAAP financial measures that demonstrate the SEC's tightening policy.[4]  One of the new C&DIs regarding forward-looking information, such as financial projections, explicitly requires

---

[2]    Mary Jo White, *Keynote Address, International Corporate Governance Network Annual Conference: Focusing the Lens of Disclosure to Set the Path Forward on Board Diversity, Non-GAAP, and Sustainability* (June 27, 2016), https://www.sec.gov/news/speech/chair-white-icgn-speech.html.

[3]    *See, e.g*., Nicolas Grabar and Sandra Flow, *Non-GAAP Financial Measures: The SEC's Evolving Views*, Harvard Law School Forum on Corporate Governance and Financial Regulation (June 24, 2016), https://corpgov.law.harvard.edu/2016/06/24/non-gaap-financial-measures-the-secs-evolving-views/; Gretchen Morgenson, *Fantasy Math Is Helping Companies Spin Losses Into Profits*, N.Y. Times, Apr. 22, 2016, http://www.nytimes.com/2016/04/24/business/fantasy-math-is-helping-companies-spin-losses-into-profits.html?_r=0.

[4]    *Non-GAAP Financial Measures, Compliance & Disclosure Interpretations*, U.S. SECURITIES AND EXCHANGE COMMISSION (May 17, 2017), https://www.sec.gov/divisions/corpfin/guidance/nongaapinterp.htm.

companies to provide any reconciling metrics that are available without unreasonable efforts.

37.    In order to make the projections for DuPont included on page 107 of the S-4 materially complete and not misleading, Defendants must provide (i) the line item projections for the financial metrics that were used to calculated the non-GAAP measures EBITDA, AFFO and UFCF; and (ii) a reconciliation table of non-GAAP measures EBITDA, AFFO and UFCF to their most comparable GAAP-compliant measures.

38.    Such projections are necessary to make the non-GAAP projections included in the S-4 not misleading.  Indeed, the Defendants acknowledge in the S-4 that disclosing non-GAAP projections may confuse stockholders due to potentially differing calculation methodologies: "[DuPont] and DLR may calculate certain non-GAAP financial metrics, including EBITDA, FFO and AFFO using different methodologies. Consequently, the financial metrics presented in each company's prospective financial information disclosures and in the sections of this joint proxy statement/prospectus with respect to the opinions of the financial advisors to [DuPont] and DLR may not be directly comparable to one another."  S-4, 106.  The S-4 further states that as a result of "uncertainties inherent in the unaudited prospective financial information, [DuPont] urges all [DuPont] stockholders and DLR stockholders not to place undue reliance on such information and to review [DuPont]'s most recent SEC filings for a description of [DuPont]'s reported financial results."  S-4, 106.

39.    The S-4 also omits certain key inputs necessary for shareholders to assess the valuation analyses performed by DuPont's financial advisor, Goldman Sachs, in support of their fairness opinion, rendering the summaries of such analyses in the S-4 incomplete and misleading.

40.    Specifically, the S-4 states that Goldman Sachs reviewed, among other things: (i) internal financial analyses and forecasts for DuPont, provided by its management; (ii) internal

financial analyses and forecasts for DLR, provided by its management; (iii) projections for the pro forma combined company contemplated by the Merger Agreement and prepared by the management of Dupont and DLR, and (iv) certain operating synergies projections created by DLR's management resulting from the Proposed Transaction in conducting its analyses and rendering its fairness opinion. S-4, 93. However, the S-4 fails to disclose (i) the projections for the pro forma combined company or (ii) the projections evidencing the synergies to result from the Proposed Transaction.

41.    In performing its *Illustrative Levered Discounted Cash Flow Analysis* ("DCF Analysis") for DuPont, DLR, and the pro forma combined company, Goldman Sachs derived a range of illustrative present values per share of the respective company's common stock by discounting to present value the estimate of dividends per share and illustrative terminal values per share of common stock. Goldman Sachs determined the illustrative terminal values by applying a range of terminal EBITDA multiples to the estimated terminal year EBITDA after subtracting an estimate of the respective company's net debt and preferred stock. S-4, 97-98.

42.    Despite disclosing how the DCF analyses were conducted, the S-4 fails to disclose, for both DuPont and DLR, certain material line items utilized by Goldman Sachs, including : (i) estimated dividends, (ii) estimated net debt, and (iii) estimated preferred stock. . The S-4 also fails to disclose (i) the perpetuity growth rates used in Goldman Sachs' DCF Analyses for DuPont and DLR, and (ii) the terminal values Goldman Sachs calculated for each company. S-4, 97-98. The omission of such information renders the summary of the DCF Analysis for both DuPont and DLR on pages 97 and 98 of the S-4 misleading.

43.    Moreover, the S-4 failed to disclose any projections for the pro forma combined company, despite the fact that Goldman Sachs stated it relied on those forecasts in conducting its

DCF Analysis. The omission of such information renders the summary of the DCF Analysis for the pro forma combined company on page 97 of the S-4 misleading.

44.     Additionally, the S-4 omits critical information regarding potential conflicts of interest on the part of Goldman Sachs. Specifically, the S-4 states that an affiliate of Goldman Sachs entered into a commitment to provide Defendant DuPont Fabros Technology, L.P. (of which DuPont is the sole general partner) with a 364-day Bridge loan facility for which affiliate(s) of Goldman Sachs will receive compensation. S-4, 101. However, the S-4 fails to disclose the amount of compensation the Goldman Sachs affiliate(s) stand to receive in connection with the bridge loan facility.

45.     In sum, the omission of the above-referenced information renders statements in the S-4 materially incomplete and misleading, in contravention of the Exchange Act. Absent disclosure of the foregoing material information prior to the special stockholders meeting to vote on the Proposed Merger, Plaintiff and the other members of the Class will be unable to make a fully-informed decision regarding whether to vote in favor of the Proposed Merger, and they are thus threatened with irreparable harm, warranting the injunctive relief sought herein.

### COUNT I
**(Against All Defendants for Violations of Section 14(a) of the Exchange Act and Rule 14a-9 and 17 C.F.R. § 244.100 Promulgated Thereunder)**

46.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

47.     Section 14(a)(1) of the Exchange Act makes it "unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or

authorization in respect of any security (other than an exempted security) registered pursuant to section 78l of this title." 15 U.S.C. § 78n(a)(1).

48.     Rule 14a-9, promulgated by the SEC pursuant to Section 14(a) of the Exchange Act, provides that communications with stockholders in a recommendation statement shall not contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

49.     SEC Regulation G has two requirements: (1) a general disclosure requirement; and (2) a reconciliation requirement. The general disclosure requirement prohibits "mak[ing] public a non-GAAP financial measure that, taken together with the information accompanying that measure, contains an untrue statement of a material fact or *omits to state a material fact necessary in order to make the presentation of the non-GAAP financial measure…not misleading*." 17 C.F.R. § 244.100(b). The reconciliation requirement requires an issuer that chooses to disclose a non-GAAP measure to provide a presentation of the "most directly comparable" GAAP measure, and a reconciliation "by schedule or other clearly understandable method" of the non-GAAP measure to the "most directly comparable" GAAP measure. 17 C.F.R. § 244.100(a). As set forth above, the S-4 omits information required by SEC Regulation G, 17 C.F.R. § 244.100.

50.     The omission of information from a Form S-4 registration statement will violate Section 14(a) and Rule 14a-9 if other SEC regulations specifically require disclosure of the omitted information.

51.     Defendants have issued the S-4 with the intention of soliciting stockholders support for the Proposed Merger. Each of the Defendants reviewed and authorized the dissemination of

the S-4, which fails to provide critical information regarding, among other things, the financial projections for the Company.

52.    In so doing, Defendants made untrue statements of fact and/or omitted material facts necessary to make the statements made not misleading.  Each of the Individual Defendants, by virtue of their roles as officers and/or directors, were aware of the omitted information but failed to disclose such information, in violation of Section 14(a).  The Individual Defendants were therefore negligent, as they had reasonable grounds to believe material facts existed that were misstated or omitted from the S-4, but nonetheless failed to obtain and disclose such information to stockholders although they could have done so without extraordinary effort.

53.    The Individual Defendants knew or were negligent in not knowing that the S-4 is materially misleading and omits material facts that are necessary to render it not misleading.  The Individual Defendants undoubtedly reviewed and relied upon the omitted information identified above in connection with their decision to approve and recommend the Proposed Merger.

54.    The Individual Defendants knew or were negligent in not knowing that the material information identified above has been omitted from the S-4, rendering the sections of the S-4 identified above to be materially incomplete and misleading.  Indeed, the Individual Defendants were required to be particularly attentive to the procedures followed in preparing the S-4 and review it carefully before it was disseminated, to corroborate that there are no material misstatements or omissions.

55.    The Individual Defendants were, at the very least, negligent in preparing and reviewing the S-4.  The preparation of a registration statement by corporate insiders containing materially false or misleading statements or omitting a material fact constitutes negligence.  The Individual Defendants were negligent in choosing to omit material information from the S-4 or

failing to notice the material omissions in the S-4 upon reviewing it, which they were required to do carefully as the Company's directors.  Indeed, the Individual Defendants were intricately involved in the process leading up to the signing of the Merger Agreement and the preparation of the Company's financial projections.

56.    DuPont is also deemed negligent as a result of the Individual Defendants' negligence in preparing and reviewing the S-4.

57.    The misrepresentations and omissions in the S-4 are material to Plaintiff and the Class, who will be deprived of their right to cast an informed vote if such misrepresentations and omissions are not corrected prior to the vote on the Proposed Merger.

58.    Plaintiff and the Class have no adequate remedy at law.  Only through the exercise of this Court's equitable powers can Plaintiff and the Class be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## COUNT II
**(Against the Individual Defendants for Violations
of Section 20(a) of the Exchange Act)**

59.    Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

60.    The Individual Defendants acted as controlling persons of DuPont within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their positions as officers and/or directors of DuPont, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the incomplete and misleading statements contained in the S-4 filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and

dissemination of the various statements that Plaintiff contends are materially incomplete and misleading.

61.     Each of the Individual Defendants was provided with, or had unlimited access to, copies of the S-4 and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

62.     In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the Exchange Act violations alleged herein, and exercised the same.    The S-4 at issue contains the unanimous recommendation of each of the Individual Defendants to approve the Proposed Merger.    They were thus directly involved in preparing this document.

63.     In addition, as set forth in the S-4 sets forth at length and described herein, the Individual Defendants were involved in negotiating, reviewing, and approving the Merger Agreement.    The S-4 purports to describe the various issues and information that the Individual Defendants reviewed and considered.    The Individual Defendants participated in drafting and/or gave their input on the content of those descriptions.

64.     By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

65.     As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and Rule 14a-9 by their acts and omissions as alleged herein.    By virtue of their positions as controlling persons, these Defendants are liable pursuant to Section 20(a) of the Exchange Act.    As a direct and proximate

result of Individual Defendants' conduct, Plaintiff and the Class will be irreparably harmed.

66.    Plaintiff and the Class have no adequate remedy at law.  Only through the exercise of this Court's equitable powers can Plaintiff and the Class be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for judgment and relief as follows:

A.    Declaring that this action is properly maintainable as a Class Action and certifying Plaintiff as Class Representative and his counsel as Class Counsel;

B.    Enjoining Defendants and all persons acting in concert with them from proceeding with the stockholders vote on the Proposed Merger or consummating the Proposed Merger, unless and until the Company discloses the material information discussed above which has been omitted from the S-4;

C.    Directing the Defendants to account to Plaintiff and the Class for all damages sustained as a result of their wrongdoing;

D.    Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and expert fees and expenses;

E.    Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

Dated:  July 21, 2017

                                                        **LEVI & KORSINSKY, LLP**

**OF COUNSEL:**                          By:  _/s/ Donald J. Enright_____
                                                        Donald J. Enright (Bar No. 13551)
**FARUQI & FARUQI, LLP**           1101 30th Street, N.W., Suite 115
Nadeem Faruqi                               Washington, DC 20007

James M. Wilson, Jr.
685 Third Ave., 26th Fl.
New York, NY 10017
Telephone: (212) 983-9330
Email: nfaruqi@faruqilaw.com
Email: jwilson@faruqilaw.com

*Counsel for Plaintiff*

Tel: (202) 524-4290
Email: denright@zlk.com

*Counsel for Plaintiff*